# EXHIBIT A



ase.net

Search for Cases by: Select Search Method... ▼

Judicial Links   |   eFiling   |   Help   |   Contact Us   |   Print        GrantedPublicAccess  Logoff DAVID_NIEMEIER

**18SL-CC03881 - LEONARD L GILLAN V WRIGHT MEDICAL TECHNOLOGY ET AL (E-CASE)**

| Case Header | Parties & Attorneys | Docket Entries | Charges, Judgments & Sentences | Service Information | Filings Due | Scheduled Hearings & Trials | Civil Judgments | Garnishments/ Execution |

This information is provided as a service and is not considered an official court record.

**Click here to eFile on Case**
Click here to Respond to Selected Documents

Sort Date Entries:  ⦿ Descending   ⦾ Ascending      Display Options: All Entries ▼

---

**11/19/2018**   ☐ **Order**
GEORGE E. MCLAUGHLIN IS ADMITTED TO PRACTICE PRO HAC VICE ON BEHALF OF PLAINTIFF.
SO ORDERED: JUDGE STANLEY WALLACH
  **Associated Entries:** 11/08/2018 - **Motion Filed** ⊞

**11/15/2018**   ☐ **Agent Served**
Document ID - 18-SMCC-8883; Served To - BARNES-JEWISH WEST COUNTY HOSPITAL; Server - ;
Served Date - 31-OCT-18; Served Time - 00:00:00; Service Type - Sheriff Department; Reason
Description - Served

☐ **Agent Served**
Document ID - 18-SMCC-8882; Served To - WRIGHT MEDICAL TECHNOLOGY INC; Server - ; Served
Date - 31-OCT-18; Served Time - 00:00:00; Service Type - Sheriff Department; Reason Description -
Served

**11/08/2018**   ☐ **Proposed Order Filed**
Order.
  **Filed By:** JAMES GREGORY KRISPIN
  **On Behalf Of:** LEONARD L. GILLAN

☐ **Receipt Filed**
Supreme Court Receipt.
  **Filed By:** JAMES GREGORY KRISPIN

☐ **Affidavit Filed**
Affidavit of George E McLaughlin.
  **Filed By:** JAMES GREGORY KRISPIN

☐ **Motion Filed**
Motion for Admission of Visiting Attorney George E McLaughlin.
  **Filed By:** JAMES GREGORY KRISPIN
  **Associated Entries:** 11/19/2018 - **Order** ⊞

**10/23/2018**   ☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-8883, for BARNES-JEWISH WEST COUNTY HOSPITAL. Summons Attached
in PDF Form for Attorney to Retrieve from Secure Case.Net and Process for Service.

☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-8882, for WRIGHT MEDICAL TECHNOLOGY INC. Summons Attached in PDF
Form for Attorney to Retrieve from Secure Case.Net and Process for Service.

Case: 4:18-cv-02012-CDP   Doc. #: 1-1   Filed: 11/30/18   Page: 3 of 76 PageID #: 14

| | | |
|---|---|---|
| **10/12/2018** | ☐ | **Filing Info Sheet eFiling** |
| | | **Filed By:** JAMES GREGORY KRISPIN |
| | ☐ | **Pet Filed in Circuit Ct** |
| | | Petition for Damages and Jury Demand. |
| | | **On Behalf Of:** LEONARD L. GILLAN |
| | ☐ | **Judge Assigned** |
| | | DIV 12 |

Case.net Version 5.13.19.3          [Return to Top of Page](#)          Released 11/05/2018

**18SL-CC03881**

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

**IN THE CIRCUIT COURT OF ST. LOUIS COUNTY**
**STATE OF MISSOURI**

| | | |
|---|---|---|
| LEONARD L. GILLAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Cause No.: _____ |
| WRIGHT MEDICAL TECHNOLOGY, INC., | ) | |
| a foreign corporation, | ) | |
| Serve:  Registered Agent | ) | |
| CSC – Lawyers Incorporating Service Co. | ) | |
| 221 Bolivar Street | ) | |
| Jefferson City, MO 65101 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BARNES-JEWISH WEST COUNTY HOSPITAL, | ) | |
| a Missouri Nonprofit Corporation, | ) | |
| Serve:  Registered Agent | ) | |
| CSC – Lawyers Incorporating Service Co. | ) | |
| 221 Bolivar Street | ) | |
| Jefferson City, MO 65101 | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**PETITION FOR DAMAGES AND JURY DEMAND**

Plaintiff, Leonard L. Gillan, by counsel, James G. Krispin, Attorney at Law, for his

Petition against Defendants, Wright Medical Technology, Inc. and Barnes-Jewish West County

Hospital, states as follows:

**NATURE OF ACTION**

1.      Plaintiff, Leonard Gillan, brings this action for his personal injuries and damages

relating to the various Defendants' development, design testing, assembling, manufacture,

packaging, labeling, marketing, distribution, supplying, and/or sale to him in the State of

Missouri a defective artificial hip product known as a "Profemur" Hip System.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

## THE PARTIES

2.      Plaintiff, Leonard L. Gillan, is a resident and citizen of the State of Indiana, at 7827 Crosshill Court, Fort Wayne, Allen County, Indiana 46825.

3.      Defendant Wright Medical Technology, Inc., is a Delaware corporation, with its principal place of business at 1023 Cherry Road, Memphis, Tennessee 38117.

4.      Defendant Wright Medical Technology, Inc., is registered to do business in the state of Missouri, and at all times relevant hereto did business in the State of Missouri.

5.      Defendant Wright Medical Technology, Inc., at times relevant hereto, was engaged in the business of designing, manufacturing, distributing, selling, marketing and/or introducing into interstate commerce, either directly or indirectly through third-parties or related entities, various prosthetic orthopedic products, including the Wright Medical Profemur® hip products that are in issue in this civil action.

6.      Defendant Barnes-Jewish West County Hospital is a Missouri nonprofit corporation, located in St. Louis County, Missouri, is registered with the Missouri Secretary of State to do business in the state of Missouri as a not-for-profit corporation, with its principal office for business at 12634 Olive Boulevard, St. Louis, Missouri 63141, and whose Registered Agent is CSC-Lawyers Incorporating Service Company, 221 Bolivar Street, Jefferson City, Missouri 65101.

7.      To the extent that Defendant Wright Medical Technology, Inc., has exhausted its applicable liability insurance coverage, is insolvent, declares bankruptcy, or otherwise may not be before this Court and a party from whom total recovery may be had for Plaintiff's claim, pursuant to § 537.762,(1) and (2), RSMo, Defendant Barnes-Jewish Hospital West, Inc., is liable to the Plaintiff for the conduct, injuries and damages alleged in this count of this Petition.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

## WRIGHT MEDICAL and the PROFEMUR® HIP

8.     In approximately the year 1985 a European manufacturer of artificial hip devices, known as Cremascoli Ortho Group ("Cremascoli"), developed the first prototype of what became known as the titanium Profemur® Modular Necks.

9.     The first prototype of what became known as the titanium Profemur® Modular Necks were patented with the European Patent Office by Cremascoli in 1986.

10.     What became known as the titanium Profemur® Modular Necks were first distributed in Europe by Cremascoli in 1986.

11.     The name PROFEMUR® was originated by Cremascoli as a brand name for certain models or designs of its artificial hip devices.

12.     Cermascoli PROFEMUR® prosthetic hip devices are the subject of medical literature published in 1996. [See: The Modular Prosthesis for Hip Revision Surgery: Experience with the Profemur Stem: Masse, Scagnelli, Trossarello, Buratti, Randelli, Basso, Dei Poli, Giaretta, Leonardi, Massetti, Pugliese: Italian Journal of Orthopaedics and Traumatology-Suppl. 1, Vol XXII. - Fasc. 2- GIUGNO 1996.]

13.     The above referenced 1996 medical literature is cited by Wright Medical in various Wright Medical Profemur® Technical Monographs that it created and distributed. [e.g., PROFEMUR™ TOTAL HIP SYSTEM, PERFORMANCE CHARACTERISTICS OF THE PROFEMUR™ TOTAL HIP SYSTEM, ©2002 Wright Medical Technology, Inc., MH688-102; and, PROFEMUR® R Revision Hip System, TECHNICAL MONOGRAPH, ©2010 Wright Medical Technology, MH688-102, Rev. 6.10.]

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

14.     In December 1999, Defendant Wright Medical Group, Inc., purchased Cremascoli Ortho, acquiring Cremascoli's Profemur® artificial hip product line, related documents, and manufacturing facilities in Toulon France.

15.     Based on publicly available patent documents of Cremascoli, it appears that there was a change in the design of the titanium Profemur® modular necks before these products were first distributed in the United States. [Hereinafter at times referred to as a "re-design".]

16.     Upon information and belief, after the acquisition of Cremascoli by Wright Medical, a re-design of the Profemur® Modular Necks at the mid-body of the neck increased the range of motion of the hip joint in an assembled artificial hip device when used with compatible Wright Medical femoral heads and acetabular components. [Hereinafter these re-designed Profemur® Modular Necks at times are referred to as the "PHA0" modular necks.]

17.     "Version" is the term Wright Medical used for the different lengths and angles of its Profemur® Modular Necks, identified by unique catalog numbers. For example, the Wright Medical Profemur® titanium varus/valgus 8 degree long neck, catalog # PHA0-1254, was one "version" of a Wright Medical Profemur® Modular Neck.

18.     By the end of the year 1998, the Cremascoli modular neck product line had been expanded to include additional "versions" of modular necks that did not exist in 1986.

19.     After the acquisition of Cremascoli, Wright Medical expanded the Profemur product line to include additional designs and "versions" of Profemur® Modular Necks that did not exist prior to its acquisition of Cremascoli.

20.     Sometime after the acquisition of Cremascoli, Wright Medical began to refer to some of its products as the "Profemur® Total Hip System."

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

21.     On September 26, 2000, Wright Medical Technology, Inc. notified the United States Food and Drug Administration [FDA] of its intent to market what it called the "PRO-FEMUR R Revision Hip System" by way of what is known as an Abbreviated 510(k) Premarket Notification. [See: FDA 510(k) K003016.]

22.     Wright Medical's Abbreviated 510(k) Premarket Notification for the PRO-FEMUR R Revision Hip System Device Description included, "twelve modular necks which are available in six versions and two lengths: Neutral, antiversion/retroversion 8° or 15°, varus/valgus 8°, or combination of anteverted/retroverted – varus/valgus (in both short and long lengths)."

23.     On December 13, 2000, Wright Medical Technology, Inc. received clearance from the FDA to market the PRO-FEMUR R Revision Hip System in the United States.

24.     The FDA itself did not test the safety or efficacy of the Profemur® R Revision Hip System stem, nor the accompanying titanium Profemur® modular necks, as a part of the Abbreviated 510(k) process.

25.     Sometime after December 13, 2000, Defendant Wright Medical Technology, Inc., began to manufacture, label, market, promote, distribute and sell in the United States the Wright Medical Profemur® Total Hip System and its components.

26.     Sometime after December 13, 2000, Defendant Wright Medical Technology, Inc., began to manufacture, label, market, promote, distribute and sell in the United States Wright Medical titanium Profemur® Modular Necks.

27.     On March 11, 2002, Wright Medical Technology, Inc. filed an application with the United States Patent and Trademark Office to register the trademark "PROFEMUR" in the United States. [See: U.S. Trademark Registration Number: 76380670.]

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

28.     After receiving the 510(k) clearance to market the PRO-FEMUR® R Revision Hip System, over time Wright Medical expanded the Profemur® prosthetic hip stem product line to include additional designs of Profemur® Stems, including hip stems branded with names such as the Profemur® Z Hip Stem, Profemur® Plasma Z Hip Stem, Profemur® LX Hip Stem, and the Profemur® TL Hip Stem, among others.

29.     From the time titanium Profemur® Modular Necks were first introduced to the United States, through the date of August 25, 2009, the Profemur® Modular Necks  that had been redesigned by Wright Medical after its acquisition of Cremascoli Ortho, [i.e., Profemur® Modular Necks that were identified by a catalog # that began with "PHA0"], were the only design, style, or versions of Profemur® modular necks that were distributed or sold in the United States by Wright Medical.

30.     Sometime after January 13, 2000, Defendant Wright Medical began to describe its Profemur® hip devices to its distributors, sales representatives, and surgeons, in printed brochures that it created, copywrote, and distributed, known as "Technical Monographs."

31.     Sometime after January 13, 2000, Defendant Wright Medical began to describe its Profemur® hip devices to its distributors, sales representatives, and surgeons, on and through internet website pages that it created, copywrote, and controlled.

32.     Sometime after January 13, 2000, Defendant Wright Medical began to promote and market its Profemur® hip devices to the general public, on and through internet website pages that it created, copywrote, and controlled.

33.     In various technical monographs material created, copywritten, and distributed by Wright Medical beginning in approximately the year 2002, and continuing into the year 2005,

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

Wright Medical made the following representations, statements, and claims about its Profemur® modular necks:

> The modular neck used with the Profemur® Hip has been employed by Wright Cremascoli for over 15 years. The necks were designed in 1985 and have been successfully implanted in over 50,000 patients requiring both primary and revision hip procedures. The necks are used in other Wright Cremascoli hip systems besides the Profemur® Hip. None of the necks has experienced a clinical failure since their inception.

[e.g., Wright Medical Technical Monograph MH688-102 ©2002, and © 2004.]

34.     Wright Medical knew that the above quoted statement by Wright Medical that, "None of the necks has experienced a clinical failure since their inception," was false when first made.

35.     Prior to December 1, 2008, Wright Medical never corrected or recanted the above quoted statement by Wright Medical that "None of the necks has experienced a clinical failure since their inception."

36.     Wright Medical never distributed in the United States any modular necks that were "designed in 1985" and had been "employed by Wright Cremascoli for over 15 years."

37.     In various Technical Monographs created, copywritten, and distributed by Wright Medical beginning in approximately the year 2002, and continuing into the year 2005, Wright Medical made the following representations, statements, and claims about its Profemur® modular necks:

> The modular neck system, designed by Cremascoli in 1985 (U.S. Patent # 4,957,510), has now been successfully implanted in over 50,000 patients requiring both primary and revision hip arthroplasty. Extensive laboratory tests have proven that the coupling between the modular neck and femoral implant guarantees:
>
> - Structural reliability
> - Absence of significant micromovement
> - Absence of fretting corrosion

7

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

[e.g., Wright Medical Technical Monograph MH688-102 ©2002, and © 2004.]

38.     The above quoted statement by Wright Medical that it, "guaranteed . . . absence of fretting corrosion," with its Profemur® modular necks was false at the time it was first made.

39.     Wright Medical has never corrected or recanted the above quoted statement that it, "guaranteed . . . absence of fretting corrosion," with its Profemur® modular necks.

40.     In various marketing and informational material published and distributed by Wright Medical, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made representations, statements, and claims about its Conserve® and Profemur® hip product lines that these products were intended for patients who wanted to return to an "active lifestyle."

41.     In various marketing and informational material published and distributed by Wright Medical, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made representations, statements, and claims about its Conserve® and Profemur® hip product lines that these products were intended for patients who wanted to return to and engage in various sporting, athletic, and lifestyle activities, such as golf, tennis, running, dirt bike racing, wrestling, active military duty, karate, and heavy labor.

42.     In various marketing and informational material published and distributed by Wright Medical, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made representations, statements, and claims about its Conserve® and Profemur® hip product lines that these products had been implanted in patients who had returned to or engaged in various sporting, athletic, and lifestyle

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

activities, such as golf, tennis, running, dirt bike racing, wrestling, active military duty, karate, and heavy labor.

43.     In various marketing and informational material published and distributed by Wright Medical, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made representations, statements, and claims about its Conserve® and Profemur® hip product lines that these products were expected to last 10 to 15 years.

44.     In marketing its Conserve® and Profemur® hip product lines to surgeons, one or more Wright Medical sales representatives made representations to one or more surgeons that Wright Medical Conserve® and Profemur® hip products were expected to last at least 20 years.

45.     Modular necks which Wright Medical represented in literature it created and distributed in the United States for its first marketing of these devices as having been "designed by Cremascoli in 1985," and "successfully implanted in over 50,000 patients," included the original modular neck design that existed prior to the re-designed [PHA0] necks.

46.     Prior to the year 2000, Cremascoli had received notice of clinical failures in the form of fractures of its (Cremascoli) modular necks that had been "designed by Cremascoli in 1985."

47.     Prior to the year 2000, Wright Medical had received notice of clinical failures in the form of fractures in Europe of the (Cremascoli) modular necks that had been "designed by Cremascoli in 1985."

48.     Once Wright Medical filed a 510(k) Premarket Notification application to distribute its Profemur® modular necks in the United States, Wright Medical had a duty to report

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

to the FDA any, each, and all events it received notice of where it was claimed that there had been a fracture in a patient of a Profemur® modular neck.

49.     Once Wright Medical received clearance to distribute titanium Profemur® modular necks in the United States as a result of its 510(k) Premarket Notification application, Wright Medical had a duty to report to the FDA any, each, and all events it received notice of where it was claimed that there had been a fracture in a patient of a Profemur® modular neck.

50.     Prior to January of 2005, Wright Medical knew of or received notice of fractures in patients of Profemur® modular necks that had been "designed by Cremascoli in 1985".

51.     Prior to April 19, 2005, Wright Medical did not report to the FDA any of the events it received notice of that a Profemur® modular neck had fractured in a patient.

52.     On or about April 19, 2005, Wright Medical first reported to the FDA that it had received notice that a Profemur® modular neck implanted in a patient had fractured.

53.     After receiving notice of a 2005 Profemur® modular neck fracture, Wright Medical received notice of additional Profemur® modular neck fractures in patients.

54.     The number of reported titanium Profemur® modular neck fractures has continued to increase, and more than 700 such modular neck fractures have been reported to Wright Medical. [See: FDA MAUDE database.]

55.     Prior to December 1, 2008, Wright Medical did not inform all orthopedic surgeons in the United States known by it to have implanted its titanium Profemur® modular necks of the reports it had received of titanium modular necks fracturing.

56.     On December 1, 2008, a "Safety Alert" was sent by Wright Medical to certain "medical professionals," which stated, in part, "[W]e have received reports of 35 modular neck failures as of November 21, 2008. Initial investigations have revealed several commonalities in

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

these failures: heavyweight males, long modular necks and patient activities such as heavy lifting and impact sports."

57.     At the time Wright sent its December 1, 2008 Safety Alert, Wright Medical in fact was aware of more than 35 titanium modular neck failures (by fracture of a Profemur® modular neck) as of November 21, 2008, if all of the reported Wright and Cremascoli modular neck fractures back to the year 1985 were counted.

58.     In the FDA Guidance Documents for Femoral Stem Prostheses DRAFT, dated August 1, 1995, available to industry at the time Wright Medical submitted its Abbreviated 510(k) clearance application for the Pro-Femur R Revision Hip System, the section titled "Contraindicated Weight Limit(s)", stated, in part, "labeling by contraindication as not for use in patients above a certain weight."

59.     In Wright Medical's Instructions for Use [hereinafter "IFU"] that accompanied the Profemur® hip devices distributed in the United States from the date of their introduction into the United States, through June of 2009, Wright stated the use of these devices to be contraindicated in "obese" patients, "[W]here obesity is defined as three times normal body weight."]

60.     Prior to August 2010, Wright Medical did not, in its IFUs for the Profemur® hip devices distributed in the United States, include a warning, precaution or other advisory as to the use of any of its Profemur® modular necks in people who weighed more than a specifically stated patient body weight.

61.     Wright Medical has never stated in its IFUs for the Profemur® hip devices distributed in the United States that the use of any of its Profemur® modular necks was contraindicated in heavyweight males.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

62.     Wright Medical has never stated in its IFUs for the Profemur® devices distributed in the United States that the use of any of its Profemur® modular necks was contraindicated in patients who engaged in heavy lifting.

63.     Wright Medical has never stated in its IFUs for the Profemur® devices distributed in the United States that the use of any of its modular necks was contraindicated in patients who engaged in impact sports.

64.     The IFU for Wright Medical Profemur® devices distributed in the United States was the same IFU document used for some other Wright Medical hip devices that did not use Profemur® Modular necks, and were not modular at the region of the artificial femoral neck.

65.     At no time did Wright Medical state in its IFUs distributed in the United States that the rate of failure by fracture of the implant was higher for its Profemur® modular neck hip devices, compared to the rate of failure by fracture for other Wright Medical hip devices that did not use modular necks, but were subject to the same IFU document.

66.     Even though some Wright Medical IFUs for the Profemur® devices in use prior to August 2010 contained a section titled, "Conditions presenting increased risk of failure include. . . .," that section of the IFU did not state that patients who weigh more than a certain patient body weight, or have a BMI at or above a certain number, or engage in a high level of physical activity, or engage in heavy lifting, or engage in impact sports, would be at an increased risk of failure (by fracture) of the modular neck component, when compared to the risk of failure for other Wright Medical hip devices using that same IFU document but that did not use modular necks.

67.     Even though some Wright IFUs for the Profemur® devices in use prior to August 2010 contained a section titled "Warning," and a subsection within titled "Modular Necks,"

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

Wright Medical did not state therein that patients weighing more than a certain patient body weight, or with a BMI at or above a certain number, or who engage in a high level of physical activity, or engage in heavy lifting, or engage in impact sports, would be at an increased risk of failure (by fracture) of the modular neck component when compared to the risk of failure (by fracture) for other Wright Medical hip devices using that same IFU document but that did not use modular necks.

68.     Even though some Wright IFUs for the Profemur® hip devices in use prior to August 2010 contained a section titled "General Product Information," that stated, "An overweight or obese patient can produce high loads on the prostheses, which can lead to failure of the prosthesis," and, "If the patient is involved in an occupation or activity which includes substantial walking, running, lifting, or muscle strain, the resultant forces can cause failure of the fixation of the device, or both," Wright Medical did not state that patients involved in an occupation or activity that included those activities created any higher risk of failure (by fracture) than would exist in any other design of artificial hip stem without a modular neck, when compared to the risk of failure for other Wright Medical hip devices using that same IFU document but that did not use modular necks.

69.     Wright Medical did not change the language in its IFUs for its Profemur® devices distributed in the United States discussing the issue of any specific patient body weight or activity levels as they may relate to modular neck fractures until August 2010, if not later.

70.     Between the dates of December 13, 2000 and August 25, 2009 all of the Profemur® modular necks distributed by Wright Medical were made of a titanium alloy, generally known as Ti6Al4V.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

71.    After Profemur® Modular Necks began to be implanted, Cremascoli and Wright Medical began to receive reports of its Profemur® titanium modular necks having fractured (i.e., broken into two pieces).

72.    After Profemur® Modular Necks began to be implanted, Cremascoli and Wright Medical began to receive reports of its Profemur® titanium modular necks having fractured (i.e., broken into two pieces) at the oblong taper (distal end) where it is seated in the "pocket" of the Profemur® stem.

73.    At some point in time prior to July 30, 2010, Wright Medical came to the conclusion that higher than normal rates of early failure of the long offset Profemur® titanium modular necks have been observed for heavyweight (>230 lbs.) patients.

74.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, case studies appeared in medical journals reporting the fracture of Wright Medical titanium Profemur® modular necks.

75.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, surgeons who had been implanting these devices began to question the safety of these devices.

76.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, some surgeons who had been implanting these devices stopped using the Wright Medical titanium modular necks.

77.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical's sales of its Profemur® hip devices the United States began to decline.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

78.     As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical did not acknowledge that modular neck fractures were a result of defective design.

79.     As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical engaged in a campaign of concealment, misinformation, deceit, and fraud, misrepresenting to surgeons the facts and truth as to the numbers, rates, and reasons for its Profemur® modular neck fractures.

80.     As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical did not inform all surgeons using these products that, based upon information that had been reported to the FDA MAUDE Database, using these devices that the long Profemur® Neck Varus/Valgus 8 Degree, Catalog # PHA0-1254, had the highest numbers of fractures, and the highest rate of fractures, of the modular necks.

81.     As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical did not inform the Plaintiff's surgeon that, based upon information that had been reported to the FDA MAUDE Database, using these devices that the long Profemur® Neck Varus/Valgus 8 Degree, Catalog # PHA0-1254, had the highest numbers of fractures, and the highest rate of fractures, of the modular necks.

82.     As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical began to design and develop a Profemur® modular neck made of a cobalt-chrome alloy [CoCr].

83.     One of the purposes of Wright Medical designing and developing a Profemur® modular neck made of CoCr was to preserve its market share of the artificial hip device market.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

84.     On or about April 16, 2009, Wright Medical submitted to the FDA an Abbreviated 510(k) premarket notification of intent to market what it called Profemur® Hip System Modular Necks. [See: FDA 510(k) K091423.]

85.     The modular necks that were the subject of the April 16, 2009, premarket notification of intent to market were made of a CoCr alloy.

86.     The modular necks that were the subject of the April 16, 2009, premarket notification of intent to market eventually became known as the Profemur® Plus CoCr Modular Neck.

87.     In that premarket notification Wright Medical represented to the FDA, "The indication of the use of the PROFEMUR® Hip System Modular Necks are identical to the previously cleared predicate devices. The design features and materials of the subject devices are substantially equivalent to those of the predicate devices." [See: FDA 510(k) K091423.]

88.     The "predicate devices" referenced in the April 16, 2009 notification of intent to market were the titanium Profemur® titanium modular necks which had received clearance by way of the FDA letter dated December 13, 2003. [See: FDA 510(k) K003016.]

89.     The design, development, and introduction of Wright Medical Profemur® Plus CoCr Modular Necks was not done as a subsequent remedial measure for any design defect that existed in the Wright Medical titanium Profemur® modular necks.

90.     Prior to August 25, 2009 Wright Medical had been informed that the proposed Profemur® Plus CoCr Modular Necks would be subject to corrosion at the neck stem junction.

91.     Prior to August 25, 2009 Wright Medical had been informed that the proposed Profemur® Plus CoCr Modular Necks would be subject to fracture at the neck stem junction.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

92.     Prior to August 25, 2009 Wright Medical had been advised not to proceed with the development, manufacture and marketing of the proposed Profemur® Plus CoCr Modular Necks.

93.     Based upon what Wright Medical knew or should have known as of August 25, 2009, a reasonable manufacturer would not have marketed the Wright Medical Profemur® Plus CoCr Varus/Valgus 8 degree long modular necks, PHAC-1254.

94.     On August 25, 2009, Wright Medical received clearance from the FDA to market, in the United States Profemur® modular necks manufactured from CoCr. [See: FDA 510(k) K091423.]

95.     Sometime after the date of August 25, 2009, Wright Medical began to market, distribute and sell in the United States Profemur® Modular Necks made of a cobalt-chrome alloy.

96.     The Wright Medical Profemur® Plus CoCr Modular Necks were marketed to be an alternative for the Wright Medical titanium Profemur® Modular Necks, compatible with all of the same Wright Medical Profemur® stems and Wright Medical Conserve® femoral heads.

97.     Wright Medical does not admit that there was, or is, any defect in the design of its titanium Profemur® modular necks that leads to premature fracture of its titanium modular necks.

98.     Wright Medical does not admit that there was, or is, any defect in the manufacture of its titanium Profemur® modular necks that leads to premature fracture of its titanium modular necks.

99.     The Profemur® Plus CoCr Modular Necks that Wright Medical began to offer to surgeons and patients included a version that was a long Varus/Valgus 8 Degree neck, identified as Catalog # PHAC-1254.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

100.    The Profemur® Plus CoCr Modular Necks that Wright Medical began to offer to surgeons and patients did not include a warning that the titanium version of the long Profemur® Varus/Valgus 8 Degree modular neck [Catalog #PHA0-1254] was the version with the highest reported numbers and rates of fractures of the neck.

101.    The Profemur® Plus CoCr Modular Necks that Wright Medical began to offer to surgeons and patients did not include a warning that the CoCr version of the long Profemur® Varus/Valgus 8 Degree modular neck [Catalog #PHAC-1254] was the same length and angulation as the titanium version with the highest reported numbers and rates of fractures, the PHA0-1254.

102.    The Profemur® Plus CoCr Modular Necks that Wright Medical designed and manufactured were designed to be used with the all of the same femoral heads and the same Profemur® hip stems as were its titanium Profemur® modular necks.

103.    In promoting its Profemur® Plus CoCr Modular Necks Wright Medical has stated, "Product complaint data reported to Wright to date does not indicate an increased risk, as compared to traditional titanium necks, of adverse events due to taper junction fretting and corrosion or fractures for Profemur® Plus CoCr Modular Necks." [See Profemur® Plus CoCr Modular Necks Frequently Asked Questions, Wright Medical publication MH619-812.]

104.    The claim by Wright Medical in promoting its Profemur® Plus CoCr Modular Necks that, "Product complaint data reported to Wright to date does not indicate an increased risk, as compared to traditional titanium necks, of adverse events due to taper junction fretting and corrosion or fractures for Profemur® Plus CoCr Modular Necks," was not supported by independent scientific testing.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

105.    The claim by Wright Medical that "Product complaint data reported to Wright to date does not indicate an increased risk, as compared to traditional titanium necks, of adverse events due to taper junction fretting and corrosion or fractures for Profemur® Plus CoCr Modular Necks" was false and misleading.

106.    In marketing its Profemur® Plus CoCr Modular Necks Wright Medical claimed that these CoCr modular necks would result in less fretting than occurred with titanium modular necks.

107.    Claims by Wright Medical that these Profemur® Plus CoCr Modular Necks would result in less fretting than occurred with titanium modular necks was not supported by independent scientific testing.

108.    Claims by Wright Medical that its Profemur® Plus CoCr Modular Necks would result in less fretting than occurred with titanium modular necks were false and misleading.

109.    The design of the Wright Medical Profemur® Plus CoCr modular neck, when coupled with the design of the Wright Medical titanium Profemur® hip stems, is such that it in fact promotes the process of fretting corrosion at the modular neck/stem junction.

110.    In promoting its Profemur® Plus CoCr Modular Necks Wright Medical claimed that the use of dissimilar metals, such as the mating of a CoCr modular neck with a titanium stem, would not result in galvanic corrosion ("battery effect") at a level that would be problematic for patients.

111.    Claims by Wright Medical that the mating of a Profemur® Plus CoCr Modular Neck with a titanium stem would not result in galvanic corrosion ("battery effect") at a level that would be problematic for patients, were not supported by unbiased sound scientific testing.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

112.    Claims by Wright Medical that the mating of its Profemur® Plus CoCr Modular Necks with its Profemur® titanium stems, would not result in galvanic corrosion ("battery effect") at a level that would be problematic for patients, were false and misleading.

113.    The design of the Wright Medical Profemur® Plus CoCr modular neck, when coupled with the design of the Wright Medical titanium Profemur® hip stems is such that it in fact promotes the process of galvanic corrosion ("battery effect") at the modular neck/stem junction.

114.    Prior to offering its Profemur® Plus CoCr Modular Necks for distribution or sale in the United States, Wright Medical did not adequately test its design of Profemur® Plus CoCr Modular Necks for fretting corrosion after implantation in patients.

115.    Prior to offering its Profemur® Plus CoCr Modular Necks for distribution or sale in the United States, Wright Medical did not adequately test its design of Profemur® Plus CoCr Modular Necks for galvanic corrosion ("battery effect") after implantation in patients.

116.    Prior to offering its Profemur® Plus CoCr Modular Necks for distribution or sale in the United States, Wright Medical did not adequately test its design of Profemur® Plus CoCr Modular Necks for galvanic corrosion ("battery effect") when mated with titanium Profemur® hip stems after implantation.

117.    Wright Medical rushed to market its Profemur® Plus CoCr Modular Necks without having adequately tested them for *in vivo* performance to resist fretting corrosion.

118.    Wright Medical rushed to market its Profemur® Plus CoCr Modular Necks without having adequately tested them for *in vivo* performance to resist galvanic corrosion.

119.    Wright Medical's rush to market was done to preserve market share and its profits from the sale of its Profemur® hip products.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

120.     Wright Medical knew or should have known that as of the date of February 6, 2013, the date Plaintiff received his Profemur® Plus CoCr Modular Neck PHAC-1254:

a)     It had not adequately tested its Profemur® Plus CoCr Modular Necks to simulate in vivo performance for resistance to fretting corrosion;

b)     It had not adequately tested its Profemur® Plus CoCr Modular Necks to simulate in vivo performance for resistance to galvanic corrosion ("battery effect") its Profemur® Plus CoCr Modular Necks would be subject to fretting corrosion;

c)     There was an increased risk of fretting corrosion at the neck stem junction;

d)     There was an increased risk of galvanic corrosion ("battery effect") at the neck stem junction; and,

e)     The Profemur® Varus/Valgus 8 degree long modular necks had the highest number, and the highest rate of fracture of the oblong taper in the pocket of the stem.

121.     The neck stem junctions of the Profemur® Plus CoCr Modular Neck PHAC-1254, coupled with a Profemur® titanium hip stem, are subject to significant micromovement which results in significant fretting corrosion, galvanic corrosion, and metal ion release.

122.     The neck stem junctions of the Profemur® Plus CoCr Modular Neck PHAC-1254, coupled with a Profemur® titanium hip stem, and the micromovement which results in significant fretting corrosion, galvanic corrosion, and metal ion release, directly and proximately causes adverse medical conditions which lead to the failure and need for revision of the patient's hip.

123.     Prior to February 6, 2013 Wright Medical had been informed that its Profemur® Plus CoCr Modular Necks would be subject to corrosion at the neck stem junction.

124.     Prior to February 6, 2013 Wright Medical had been informed that its Profemur® Plus CoCr Modular Necks would be subject to fracture at the neck stem junction.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

125.    Prior to February 6, 2013, Wright Medical began to receive notice from surgeons that its Profemur® Plus CoCr Modular Necks were corroding, resulting in the need for revision surgery to remove and replace the patient's implanted Profemur® hip system.

126.    Upon information and belief, product complaint data reported to Wright Medical prior to February 6, 2013, did indicate an increased risk of adverse events due to taper junction fretting and corrosion for Wright Medical Profemur® Plus CoCr Modular Necks when coupled with Wright Medical Profemur® hip stems, as compared to traditional titanium necks.

127.    Upon information and belief, Product complaint data reported to Wright Medical prior to February 6, 2013 did indicate an increased risk of adverse events due to galvanic corrosion ("battery effect"), as compared to traditional titanium necks when coupled with Wright Medical Profemur® hip stems.

128.    Based upon what Wright Medical knew or should have known as of February 6, 2013, a reasonable manufacturer would have ceased the distribution of the Wright Medical Profemur® Plus CoCr Varus/Valgus 8 degree long modular necks, PHAC-1254, prior to that date.

129.    Based upon what Wright Medical knew or should have known as of February 6, 2013, Wright Medical should have ceased the distribution of the Profemur® Plus CoCr Modular Neck PHAC-1254, prior to that date.

130.    Based upon what Wright Medical knew or should have known as of February 6, 2013, a reasonable manufacturer would have formally recalled the Profemur® Plus CoCr Modular Neck PHAC-1254, prior to that date.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

131.    Based upon what Wright Medical knew or should have known as of February 6, 2013, Wright Medical should have formally recalled the Profemur® Plus CoCr Modular Neck PHAC-1254, prior to that date.

132.    Based upon what Wright Medical knew or should have known as of February 6, 2013, prior to that date a reasonable manufacturer would have published information that its claims that product complaint data did not indicate an increased risk of adverse events due to taper junction fretting and corrosion for Wright Medical Profemur® Plus CoCr Modular Necks when coupled with Wright Medical Profemur® hip stems had now been shown not to be true.

133.    Based upon what Wright Medical knew or should have known as of February 6, 2013, prior to that date Wright Medical should have published information that its claims that product complaint data did not indicate an increased risk of adverse events due to taper junction fretting and corrosion for Wright Medical Profemur® Plus CoCr Modular Necks when coupled with Wright Medical Profemur® hip stems had now been shown not to be true.

134.    Based upon what Wright Medical knew or should have known as of February 6, 2013, prior to that date a reasonable manufacturer would have published information that its claims that product complaint data did not indicate an increased risk of galvanic corrosion ("battery effect") for Wright Medical Profemur® Plus CoCr Modular Necks when coupled with Wright Medical Profemur® hip stems had now been shown not to be true.

135.    Based upon what Wright Medical knew or should have known as of February 6, 2013, prior to that date Wright Medical should have published information that its claims that product complaint data did not indicate an increased risk of galvanic corrosion ("battery effect") for Wright Medical Profemur® Plus CoCr Modular Necks when coupled with Wright Medical Profemur® hip stems had now been shown not to be true.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

136.     Based upon what Wright Medical knew or should have known as of February 6, 2013, prior to that date a reasonable manufacturer would have informed orthopedic surgeons using its Profemur® hip products that its claims that product complaint data did not did indicate an increased risk of galvanic corrosion ("battery effect") for Wright Medical Profemur® Plus CoCr Modular Necks when coupled with Wright Medical Profemur® hip stems had now been shown not to be true.

137.     Based upon what Wright Medical knew or should have known as of February 6, 2013, prior to that date Wright Medical should have informed orthopedic surgeons using its Profemur® hip products that its claims that product complaint data did not did indicate an increased risk of galvanic corrosion ("battery effect") for Wright Medical Profemur® Plus CoCr Modular Necks when coupled with Wright Medical Profemur® hip stems had now been shown not to be true.

138.     The neck stem junctions of the Profemur® CoCr modular neck, coupled with a Profemur® titanium hip stem, are subject to significant micromovement which result in significant fretting corrosion, galvanic corrosion, and metal ion release.

139.     The neck stem junctions of the Profemur® CoCr modular neck, coupled with a Profemur® titanium hip stem, and the micromovement which results in significant fretting corrosion, galvanic corrosion, and metal ion release, directly and proximately causes adverse medical conditions which lead to the failure, fracture of the neck, and need for revision of the hip.

140.     Based upon the facts and allegations set forth above, the Wright Medical Profemur® CoCr modular neck and Profemur® hip stem system are defective in their design in that the risks that were inherent in this product being used for hip replacement, when weighed

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

against the utility or benefit derived from the product, outweigh the benefit which might have been gained by placing this defective product in the body of Plaintiff Leonard L. Gillan.

141.  Based upon the facts and allegations set forth above, the Wright Medical Profemur® CoCr modular neck and Profemur® hip stem system are defective in their manufacturing in that they do not comply with their intended design, specifications, in that the risks that were inherent in this product being used for hip replacement, when weighed against the utility or benefit derived from the product, outweigh the benefit which might have been gained by placing this defective product in the body of Plaintiff Leonard L. Gillan.

142.  Based upon the facts and allegations set forth above, the Wright Medical Profemur® CoCr modular neck and Profemur® hip stem system are defective in their labeling in that they do not perform as represented, and the risks that were inherent in this product being used for hip replacement, when weighed against the utility or benefit derived from the product, outweigh the benefit which might have been gained by placing this defective product in the body of Plaintiff Leonard L. Gillan.

143.  Based upon the facts and allegations set forth above, the Wright Medical Profemur® Plus CoCr Modular Necks are unreasonably dangerous in that the risks that were inherent in this product being used for hip replacement, when weighed against the utility or benefit derived from the product, outweigh the benefit which might have been gained by placing this defective product in the body of Plaintiff Leonard L. Gillan.

144.  Defendant Wright Medical Technology, Inc. was negligent in their design, manufacture, distribution and sale, marketing, promotion, and labeling of the Wright Medical Profemur® CoCr modular neck and Profemur® hip stem system.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

145.   Defendant Wright Medical Technology, Inc. was negligent in the failure to warn patients or surgeons that they had received product complaint data that did indicate an increased risk of adverse events due to taper junction fretting and corrosion.

146.   Defendant Wright Medical Technology, Inc. was negligent in the failure to warn patients or surgeons that they had received product complaint data that did indicate an increased risk of adverse events due to galvanic corrosion ("battery effect").

147.   Defendant Wright Medical Technology, Inc. was negligent in their failure to cease distribution of the Wright Medical Profemur® CoCr Varus/Valgus 8 degree long modular necks, Catalog # PHAC-1254, before the date of February 6, 2013.

148.   C. Lowry Barnes, M.D., is an orthopedic surgeon who had for a time been a paid consultant for Wright Medical.

149.   C. Lowry Barnes, M.D., was a named contributor to or author of various Profemur® Surgical Techniques brochures for Wright Medical.

150.   At the request of Wright Medical, C. Lowry Barnes, M.D., participated in the design and development of the Wright Medical Profemur® Plus CoCr Modular Necks.

151.   At some point in time, C. Lowry Barnes, M.D., informed Wright Medical that its Profemur® Plus CoCr Modular Necks were corroding after implantation in patients.

152.   At some point in time C. Lowry Barnes, M.D., informed Wright Medical that its Profemur® Plus CoCr Modular Necks were corroding after implantation in patients, resulting in the need for revision surgery to remove and replace the patient's implanted Profemur® hip system.

153.   At some point in time, C. Lowry Barnes, M.D., informed Wright Medical that its Profemur® Plus CoCr Modular Necks were defective.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

154.    At some point in time, C. Lowry Barnes, M.D., informed Wright Medical that its Profemur® Plus CoCr Modular Necks should immediately be removed from the market.

155.    Wright Medical ignored the recommendations of its paid consultant, C. Lowry Barnes, M.D., and continued to manufacture, distribute and sell its Profemur® Plus CoCr Modular Necks for implantation in patients by orthopedic surgeons.

156.    At some point in time before January 9, 2014, Wright Medical began to receive notice that its long Profemur® Plus CoCr Modular Necks PHAC-1254, were fracturing.

157.    On January 9, 2014, the Wright Medical OrthoRecon operating segment, was sold for approximately $285 million.

158.    In its form 10-Q, filed with the United States Securities and Exchange Commission, for the quarter ended March 31, 2014, Wright Medical Group, Inc., the parent corporation of Defendant Wright Medical Technology, Inc., states:

> On January 9, 2014, pursuant to the previously disclosed Asset Purchase Agreement, dated as of June 18, 2013 (the Purchase Agreement), by and among us, MicroPort Scientific Corporation, a corporation formed under the laws of the Cayman Islands (MicroPort), and MicroPort Medical B.V., a besloten vennootschap formed under the laws of the Netherlands, we completed our divesture and sale of our business operations operating under the OrthoRecon operating segment (the OrthoRecon Business) to MicroPort.  Pursuant to the terms of the Asset Purchase Agreement, the purchase price (as defined in the Purchase Agreement) for the OrthoRecon Business was approximately $285 million (including an estimated working capital target adjustment), which MicroPort paid in cash.

159.    The sale by Wright Medical of its OrthoRecon operating segment to MicroPort included the Wright Medical Profemur® product line, and its manufacturing facilities in Arlington, Tennessee.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

160.   MicroPort Orthopedics, Inc., is the successor in interest to, or the United States operating subsidiary of, MicroPort Scientific Corporation and MicroPort Medical B.V., that had purchased the Wright Medical OrthoRecon operating segment.

161.   Upon belief, prior to the sale of the Wright Medical OrthoRecon operating segment to MicroPort on January 9, 2014, Wright Medical did not inform MicroPort that a surgeon who had participated in the design and development of the Wright Medical Profemur® Plus CoCr Modular Necks, C. Lowry Barnes, M.D., had informed Wright Medical that its Profemur® Plus CoCr Modular Necks were corroding after implantation, were defective, and that the Profemur® Plus CoCr Modular Necks should be immediately removed from the market.

162.   Since the date of January 9, 2014 MicroPort Orthopedics, Inc., has had the obligation to conduct post-market surveillance related to the Profemur® hip product line since acquiring those products from Wright Medical in 2014.

163.   Under section 522 of the Federal Food, Drug and Cosmetic Act (the Act), 21 U.S.C. § 360, and 21 CFR Part 822, MicroPort was obligated to conduct postmarket surveillance related to the Profemur® Plus CoCr Modular Necks, the Profemur® LX Hip Stem, and the Conserve Total Femoral head, among other devices.

164.   MicroPort failed to comply with requirements of postmarket surveillance study order PS110070, dated May 6, 2011, whereby the Food and Drug Administration (FDA) ordered Wright Medical Technology, Inc. (Wright Medical), former proprietor of MicroPort Orthopedics, Inc. (MicroPort), to conduct postmarket surveillance for the Profemur® LX Hip Stem, and the Conserve Total Femoral head, among other devices.

165.   As a result of its purchase of the Wright Medical OrthoRecon operating segment on January 9, 2014, MicroPort is legally liable for any design or manufacturing defects that may

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

exist in Wright Medical Profemur® Plus CoCr Modular Necks, regardless of when those CoCr modular necks were manufactured, distributed, sold or implanted after that date.

166.    Defendant Wright Medical has agreed to defend, indemnify and hold harmless MicroPort for any liability it may have for injuries or damages caused by Profemur® Plus CoCr Modular necks that were implanted in any patient before the date of January 9, 2014.

167.    At some point in time after January 9, 2014, MicroPort began to receive notice of Profemur® Plus CoCr Modular Neck, PHAC-1254 fractures in patients.

168.    The fractures of the Profemur® Plus CoCr Modular Neck PHAC-1254 were all occurring in the pocket of the Profemur® stem.

169.    No other versions of the Profemur® Plus CoCr Modular Necks have been reported to have fractured, other than the Profemur® Plus CoCr Modular Neck PHAC-1254.

170.    On August 7, 2015, MicroPort initiated Class I Voluntary Device Recall for its Profemur® Plus CoCr Modular Neck PHAC-1254.

171.    Class I recalls are the most serious type of recall and involve situations in which there is a reasonable probability that use of these products will cause serious adverse health consequences or death.

172.    MicroPort sent a letter dated August 7, 2015, via FedEx to all affected customers, wherein they were informed of a voluntary hip replacement recall by MicroPort Orthopedics Inc.; surgeons, managers, distributors and hospitals were instructed to cease distributing and using the Profemur® Plus CoCr Modular Neck PHAC-1254, for hip replacement surgeries.

173.    On August 7, 2015, MicroPort Orthopedics Inc. informed distributors and hospital staff of a voluntary device product recall. Distributors and hospital staff, including risk managers and surgeons, were instructed to stop using and distributing the affected product, and return the

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

recalled product to MicroPort Orthopedics Inc. Distribution Center at 11481 Gulf Stream, Arlington, Tennessee 38002.

174.    All lots of the Profemur® Plus CoCr Modular Neck PHAC-1254 were subject to the recall.

175.    At the time MicroPort initiated the recall of the Profemur® Plus CoCr Modular Neck PHAC-1254, it reported that 10,489 units was the quantity in commerce.

176.    At the time MicroPort initiated the recall of the Profemur® Plus CoCr Modular Neck PHAC-1254, more than 1,000 of these devices had been implanted in patients.

177.    The Profemur® Plus CoCr Modular Neck PHAC-1254 implanted in Plaintiff Leonard L. Gillan was one of the Profemur® Plus CoCr Modular Necks subject to the Class I recall.

178.    Defendant Wright Medical Technology, Inc., was negligent in its failure to recall the Wright Medical Profemur® CoCr modular neck before the date of February 6, 2013.

## OPPRESSIVE, FRAUDULENT, MALICIOUS AND GROSSLY NEGLIGENT CONDUCT

179.    Considering all of the facts, as alleged above, going to market with the Profemur® Plus CoCr Modular Necks is clear and convincing evidence of willful, oppressive, fraudulent, and malicious conduct, was grossly negligent, and demonstrates a complete indifference to, and a conscious disregard for the safety of patients.

180.    The failure of Defendant Wright Medical Technology, Inc., to warn patients or surgeons that they had received product complaint data that did indicate an increased risk of fracture with the Profemur® Plus CoCr Modular Necks and adverse events due to taper junction fretting and corrosion, is clear and convincing evidence of willful, oppressive, fraudulent, and

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

malicious conduct, was grossly negligent, and demonstrates a complete indifference to, and a conscious disregard for the safety of patients.

181.    The failure of Defendant Wright Medical Technology, Inc., to cease the distribution of the Profemur® Plus CoCr Modular Neck PHAC-1254 before the date of February 6, 2013, is clear and convincing evidence of willful, oppressive, fraudulent, and malicious conduct, was grossly negligent, and demonstrates a complete indifference to, and a conscious disregard for the safety of patients.

182.    The failure of Defendant Wright Medical Technology, Inc., to recall Profemur® Plus CoCr Modular Neck PHAC-1254 before the date of February 6, 2013, is clear and convincing evidence of willful, oppressive, fraudulent, and malicious conduct, was grossly negligent, and demonstrates a complete indifference to, and a conscious disregard for the safety of patients.

183.    The failure of Defendant Wright Medical Technology, Inc., to heed the advice of its paid consultant, C. Lowry Barnes, M.D., to cease the distribution of the Profemur® Plus CoCr Modular Necks, but to continue to market those devices for implantation by surgeons in patients, is clear and convincing evidence of willful, oppressive, fraudulent, and malicious conduct, was grossly negligent, and demonstrates a complete indifference to, and a conscious disregard for the safety of patients.

184.    The failure of Defendant Wright Medical Technology, Inc., to disclose to MicroPort, prior to its purchase of the Profemur® product line on January 9, 2014, the truthful and accurate history of the information and advice it had received about the defects in the Profemur® Plus CoCr Modular Necks, and the risk those products posed to patients, is clear and convincing evidence of willful, oppressive, fraudulent, and malicious conduct, was grossly

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

negligent, and demonstrates a complete indifference to, and a conscious disregard for the safety of patients.

## WARRANTIES

185.    Statements and representations made by Defendant Wright Medical Technology, Inc., to surgeons and to the public, as set forth in this Petition, constitute express warranties as to the performance, durability, and longevity of the Wright Medical Profemur® Plus CoCr Modular Necks, and the Wright Medical artificial hip stems they were intended to be used with.

186.    By law certain implied warranties of merchantability and fitness for intended use are applicable to the Wright Medical Profemur® Plus CoCr Modular Necks, and the Wright Medical artificial hip stems they were intended to be used with.

187.    The micromotion, fretting corrosion, galvanic corrosion, and fracture of the Plaintiff Leonard L. Gillan's Wright Medical Profemur® Plus CoCr Modular Neck at the junction with the Profemur® Stem was a breach of the applicable express warranties of Defendant Wright Medical Technology, Inc.

188.    The micromotion, fretting corrosion, galvanic corrosion, and fracture of the Plaintiff Leonard L. Gillan's Profemur® Plus CoCr Modular Neck at the junction with the Profemur® Stem was a breach of the applicable implied warranties of merchantability and fitness for intended use by Defendant Wright Medical Technology, Inc.

## PLAINTIFF LEONARD L. GILLAN

189.    On February 6, 2013, Plaintiff Leonard L. Gillan had a Wright Medical artificial hip implanted in his right hip in a procedure known as a total hip arthroplasty (THA).

190.    Paul S. Lux, M.D., was the surgeon who implanted Plaintiff's Wright Medical artificial hip.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

191.    Plaintiff's February 6, 2013 hip implant surgery was performed at Barnes-Jewish West County Hospital in St. Louis, Missouri.

192.    Paul S. Lux, M.D., did not violate any generally accepted standards of care in the field of orthopedic surgery in his care and treatment of Plaintiff in any of the following respects:

(a)    In the care or treatment that he provided to Plaintiff prior to beginning the hip implant surgery;

(b)    In the information that he did or did not provide Plaintiff prior to beginning the hip implant surgery;

(c)    In the selection of the Wright Medical Profemur® CoCr modular neck, or any other Wright Medical artificial hip devices, that were implanted in Plaintiff;

(d)    In the hip implant surgery he performed on Plaintiff;

(e)    In the care or treatment that he provided to Plaintiff, subsequent to Plaintiff's hip implant surgery; and,

(f)    In the information that he did or did not provide to Plaintiff subsequent to Plaintiff's hip implant surgery.

193.    Based upon the patient population in which the Defendant Wright Medical intended its Profemur® artificial hip devices to be implanted, at the time of implantation with his Wright Medical Profemur® hip devices, Plaintiff Leonard L. Gillan was an appropriate patient to be implanted with the Wright Medical Profemur® hip devices he received.

194.    Paul S. Lux, M.D., recommended the Wright Medical Profemur® hip devices to Plaintiff and indicated that the Wright Medical Profemur® hip devices were appropriate for him.

195.    Leonard L. Gillan reasonably relied upon Paul S. Lux, M.D., in deciding to proceed with hip replacement surgery and have Wright Medical Profemur® hip devices implanted in him.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

196.    "Patient Testimonials" and "Patient Stories" published by Defendant Wright Medical on various Wright Medical's internet website pages prior to February 6, 2013, promoting Wright Medical's hip products, illustrate and demonstrate the patient population, and activity levels, that Wright Medical intended and expected for its Profemur® and Conserve® hip devices.

197.    Before the Plaintiff's February 6, 2013 surgery, Defendant Wright Medical supplied the Wright Profemur® and Conserve® hip devices that were implanted in Plaintiff to Barnes-Jewish West County Hospital in St. Louis, Missouri.

198.    On February 6, 2013, Barnes-Jewish West County Hospital provided to Plaintiff the Wright Profemur® and Conserve® hip devices that were implanted in him by Dr. Lux at Barnes-Jewish West County Hospital in St. Louis, Missouri.

199.    The Wright Profemur® and Conserve® hip devices that were implanted in Plaintiff by Dr. Lux at Barnes-Jewish West County Hospital in St. Louis, Missouri were available to Plaintiff at that location only by sale from Barnes-Jewish West County Hospital, and on that day, and at that location, could not have been acquired by the Plaintiff for implantation into his body from any source other than Barnes-Jewish West County Hospital.

200.    On February 6, 2013 Barnes-Jewish West County Hospital sold to Plaintiff Leonard L. Gillan the Wright Profemur® and Conserve® hip devices that were implanted in him at Barnes-Jewish West County Hospital.

201.    Barnes-Jewish West County Hospital sold to Plaintiff the Wright Profemur® and Conserve® hip devices that were implanted in him by Dr. Lux at Barnes-Jewish West County Hospital in St. Louis, Missouri, a price more than it paid Wright Medical for those devices, and made a profit on the sale of those devices.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

202.     In his total hip replacement surgery on February 6, 2013, Plaintiff Leonard L. Gillan had implanted in his right hip the following specific Wright Medical artificial hip devices:

  a.  Profemur® Plus CoCr Modular Neck
     Ref: PHAC-1254
     Lot #: 12011258630

  b.  Conserve® Total BCH® Femoral Head
     Catalog #: 38CH4400
     Lot: 1479434

  c.  Profemur® LX Stem
     Catalog #: PRLX5814
     Lot: 1431723

  d.  Conserve® Total Neck Sleeve
     Catalog #: 38NS0N35
     Lot #: 1454974

203.     Based upon the patient population that Wright Medical intended their Profemur® and Conserve® hip devices to be implanted in, and when Plaintiff Leonard L. Gillan had these devices implanted in him, he was an appropriate patient to be implanted with these Wright Medical Profemur® and Conserve® hip devices.

204.     Subsequent to the date of implantation of his Wright Medical artificial hip, Plaintiff used his Wright Medical artificial hip in a normal and reasonably anticipated and expected manner.

205.     Subsequent to the date of implantation of his Wright Medical artificial hip, Plaintiff used his Wright Medical artificial hip in a manner consistent with what was anticipated and expected in the patient population these devices were intended for.

206.     Subsequent to the date of implantation of his Wright Medical artificial hip, Plaintiff used his Wright Medical artificial hip in a manner consistent with many of the

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

representations made in "Patient Testimonials" and "Patient Stories" that appeared in the Wright Medical websites.

207.   After initial recovery from his February 6, 2013 surgery, for a period of time Plaintiff's Wright Medical artificial hip performed as expected, and the pain and disability Plaintiff had experienced in his right hip prior to his February 6, 2013 surgery had been substantially relieved.

208.   On August 7, 2015, MicroPort initiated an FDA Class I Voluntary Device Recall of all Profemur® Plus CoCr Modular Necks PHAC-1254, including the Profemur® Plus CoCr Modular Neck that had been implanted in Plaintiff Leonard L. Gillan.

209.   Information posted on the FDA website on October 2, 2015, related to the recall of the Profemur® Plus CoCr Modular Neck PHAC-1254 stated:

> If the modular neck fractures, the patient may experience sudden pain, instability and difficulty walking and performing common task. An acute fracture will require revision surgery to remove and replace the neck and stem components. Acute fracture and emergency revision surgery is a serious adverse health consequence and could lead to neurovascular damage, hematoma, hemorrhage, and even death.

210.   On or about the date of October 23, 2016, approximately 44½ months after his February 6, 2013 implant surgery, and approximately one year after the recall of this product, Plaintiff Leonard L. Gillan, suffered a fracture of the Profemur® Plus CoCr Modular Neck PHAC-1254 that had been implanted in him on February 6, 2013.

211.   On October 27, 2016, surgery, known as a "revision" surgery, was performed at The Orthopaedic Hospital, 7952 West Jefferson Boulevard, Fort Wayne, Indiana 46804, on Plaintiff Leonard L. Gillan's right hip by George T. Kolettis, M.D., to remove and replace the failed and damaged components of his Wright Medical artificial hip.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

212.    Plaintiff Leonard L. Gillan's October 27, 2016 surgery included an extended trochanteric osteotomy for removal of the otherwise well-fixed femoral component.

213.    In the course of the revision surgery performed on October 27, 2016, George T. Kolettis, M.D., removed all of the Plaintiff's originally implanted Wright Medical hip devices, with the exception of the Conserve Total Neck Sleeve, which was well-fixed and undamaged.

214.    No Wright Medical or MicroPort hip devices were implanted in the Plaintiff in his October 27, 2016 revision surgery.

215.    With the exception of the fact that the Modular Neck component of Plaintiff's artificial hip had fractured, at the time of Plaintiff's revision surgery each of the devices of the Plaintiff's Wright Medical hip was in substantially the same condition in all relevant respects as when they left the control of Defendant Wright Medical.

216.    With the exception of the fact that the CoCr Modular Neck component of Plaintiff's artificial hip had fractured and caused injury to the Plaintiff, at the time of his revision on October 27, 2016, Plaintiff's Wright Medical hip was not otherwise in need of hip revision surgery.

217.    If the Plaintiff had not had revision surgery to remove and replace the fractured Profemur® Plus CoCr Modular Neck, and the Profemur® stem that contained the distal fractured remnant of the modular neck, Plaintiff Leonard L. Gillan would not have been able to bear weight on his right leg, would not have been able to walk without crutches, would have needed adaptive devices in his home and vehicles to accommodate for his loss of ambulation, would have required a wheelchair for most movement, and would have been at significant risk of medical complications in his right leg that may have eventually resulted in its amputation, and/or to premature death.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

### PLAINTIFF'S CAUSE OF ACTION

218.    On the date of February 6, 2013, in St. Louis County, Missouri, Barnes-Jewish West County Hospital sold to Plaintiff Leonard L. Gillan, a Profemur® Plus CoCr Modular Neck PHAC-1254.

219.    The Profemur® Plus CoCr Modular Neck PHAC-1254 sold to Plaintiff Leonard L. Gillan was designed, manufactured, labeled, and placed into the stream of commerce by Defendant Wright Medical.

220.    Defendant Wright Medical knew and intended that Profemur® Plus CoCr Modular Necks it designed, manufactured, labeled, and placed into the stream of commerce would be delivered to Barnes-Jewish West County Hospital, and implanted into patients at that hospital by orthopedic surgeon, Paul Lux, M.D.

221.    Unknown to the Plaintiff, immediately after implantation into his body of the Wright Medical Profemur® Plus CoCr Modular Neck PHAC-1254, mated with a titanium Profemur® LX Stem, the process of micromotion, fretting corrosion, and galvanic corrosion began at the neck-stem junction of the device, causing damage to the device, and leading to its ultimate fracture and catastrophic failure, and injury to the Plaintiff.

222.    Prior to October 24, 2016, Plaintiff had neither knowledge nor notice that there was any defect in the design, manufacture or labeling of his implanted Profemur® Plus CoCr Modular Neck PHAC-1254.

223.    Prior to October 24, 2016, Plaintiff had neither knowledge nor notice that he had suffered any injury because of any negligence, actions or inactions, errors or omissions, by any of the defendants.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

224.    It was not until October 24, 2016 that Plaintiff first had any notice or knowledge that his injuries and/or that the failure of the Profemur® Plus CoCr Modular Neck implanted in his right hip was the result of any defects in the design, manufacture, warning or labeling of his implanted Profemur® Plus CoCr Modular Neck.

225.    Prior to October 24, 2016, Plaintiff did not know, and could not have known by the exercise of reasonable diligence, that his right hip had been injured by a defect in his Profemur® Plus CoCr Modular Neck.

226.    Prior to October 24, 2016, Plaintiff did not know and could not have known by the exercise of reasonable diligence of any cause of any injury to his right hip was a direct or proximate result of a defect in his Profemur® Plus CoCr Modular Neck.

227.    Prior to October 24, 2016, Plaintiff had no reason to know or suspect that any of the Wright Medical Profemur® hip device implanted in his right hip was defective.

228.    Plaintiff's causes of action alleged in this Petition did not accrue until October 24, 2016.

**PLAINTIFF'S INJURIES AND DAMAGES**

229.    On or about October 24, 2016, as a result of years of micromotion and corrosion, and metal fatigue, of the oblong taper of the Profemur® Plus CoCr Modular Neck where it seated in the pocket of the Profemur® LX stem, the PHAC-1254 long Profemur® CoCr modular neck implanted in Plaintiff Leonard L. Gillan's right hip catastrophically failed, breaking into two pieces, causing physical injury to the Plaintiff.

230.    On or about October 24, 2016, the Profemur® Plus CoCr Modular Neck implanted in Plaintiff Leonard L. Gillan's right hip catastrophically failed as a direct and proximate result

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

of the actions, conduct, negligence, and breach of warranties of Defendant Wright Medical Technology, Inc., as alleged in this Petition.

231.    As a direct and proximate result of the conduct of Defendant Wright Medical Technology, Inc., as set forth in this Petition, Plaintiff Leonard L. Gillan sustained injuries and damages including, but not limited to undergoing surgery to remove and replace his failed Wright Medical hip; past and future pain and anguish, both in mind and in body; permanent diminishment of his ability to participate in and enjoy the affairs of life; medical bills associated with the replacement procedure and recovery therefrom; future medical expenses; loss of enjoyment of life; disfigurement; physical impairment, and other injuries not fully known at this time.

232.    Plaintiff Leonard L. Gillan's injuries suffered were both factually and proximately caused by the defective product of the Defendant Wright Medical Technology, Inc.

233.    Plaintiff Leonard L. Gillan's injuries suffered were both factually and proximately caused by the unreasonably dangerous product of the Defendant Wright Medical Technology, Inc.

234.    Plaintiff Leonard L. Gillan is entitled to recover for all economic and special damages incurred, including but not limited to damages for subsequent surgeries, rehabilitative services, follow up doctor visits and all expenditures incurred as a result of the additional operations and follow up procedures.

235.    Plaintiff Leonard L. Gillan is entitled to compensation for permanent disability as a result of the failure of this hip replacement device which caused substantial injury.

236.    Plaintiff Leonard L. Gillan further shows that he is entitled to recover for all noneconomic and compensatory damages allowed by law, including, but not limited to, pain and

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

suffering for all pain and suffering that he has incurred as a result of the defective product, the follow-up surgery, rehabilitation, and constant pain that occurs as a result of the failure of the product.

## LIABILITY

### COUNT 1 – NEGLIGENCE

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in this Petition.

237.    Defendant Wright Medical Technology, Inc., owed a duty of reasonable care to the general public, including the Plaintiff, in its design, testing, manufacturing, inspection, labeling, warning, marketing, distributing, placing into the stream of commerce, and selling the Profemur$^®$ Plus CoCr Modular Neck PHAC-1254, and the Wright Medical Profemur$^®$ Total Hip System.

238.    Upon information and belief, some Wright Medical Profemur$^®$ Plus CoCr Modular Necks, PHAC-1254, negligently have been manufactured in such a way that they do not meet their intended design specifications or tolerances.

239.    Upon information and belief, some Wright Medical Profemur$^®$ Plus CoCr Modular Necks, PHAC-1254, negligently have been manufactured in such a way that they do not meet their intended manufacturing specifications or tolerances.

240.    Upon information and belief, some Wright Medical Profemur$^®$ Plus CoCr Modular Necks, PHAC-1254, negligently have been manufactured in such a way that they do not meet their intended performance specifications.

241.    The Wright Medical Profemur$^®$ Plus CoCr Modular Necks, PHAC-1254, that have been negligently designed and/or manufactured fail by fracture of the modular neck in the

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

pocket of the stem when being used as intended and reasonably anticipated in patients who were appropriate to receive these devices in hip arthroplasty surgery.

242.    Upon information and belief, the Wright Medical Profemur® Plus CoCr Modular Neck PHAC-1254, sold to and implanted in the Plaintiff, was one of the negligently designed and/or manufactured PHAC-1254 Profemur® Plus CoCr Modular Necks.

243.    Defendant Wright Medical Technology, Inc., breached its duty to the general public, and to the Plaintiff, by negligently and defectively designing, manufacturing, assembling, inspecting, testing, labeling, warning, marketing, distributing and selling the Wright Medical Profemur® Plus CoCr Modular Neck PHAC-1254, in a defective and unreasonably unsafe condition including, but not limited to, its propensity fracture at the neck-stem junction.

244.    Defendant Wright Medical Technology, Inc., owed Plaintiff a duty of reasonable care to discover the defects in the Profemur® Plus CoCr Modular Neck PHAC-1254, and to inform and warn Plaintiff of the defect once it was discovered.

245.    Defendant Wright Medical Technology, Inc., was negligent in the particulars set forth in this Petition, and such negligence was a direct and proximate cause of the Plaintiff's injuries and damages set forth herein.

246.    To the extent that Defendant Wright Medical Technology, Inc., has exhausted its applicable liability insurance coverage, is insolvent, declares bankruptcy, or otherwise may not be before this Court and a party from whom total recovery may be had for Plaintiff's claim, pursuant to § 537.762,(1) and (2), RSMo, Barnes-Jewish West County Hospital is liable to the Plaintiff for the conduct, injuries and damages alleged in this count of this Petition.

**COUNT 2 – STRICT PRODUCT LIABILITY**

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Petition.

247.    The Wright Medical Profemur® Plus CoCr Modular Neck PHAC-1254, and the Wright Medical Profemur® Total Hip System was used by the Plaintiff Leonard L. Gillan in a manner that was reasonably anticipated.

248.    The Profemur® Plus CoCr Modular Neck PHAC-1254, and the Wright Medical Profemur® Total Hip System used in Plaintiff's hip replacement surgery were not reasonably safe for their intended uses and were defective as described herein at the time that they were sold.

249.    The Profemur® Plus CoCr Modular Neck PHAC-1254, and the Wright Medical Profemur® Total Hip System used in Plaintiff's hip replacement surgery were not reasonably safe for their intended use and were defective as described herein with respect to the design at the time that they were sold.

250.    The Profemur® Plus CoCr Modular Neck PHAC-1254, and the Wright Medical Profemur® Total Hip System used in Plaintiff's hip replacement surgery were not reasonably safe for their intended use and were defective as described herein with respect to their manufacture at the time that they were sold.

251.    The Profemur® Plus CoCr Modular Neck PHAC-1254, and the Wright Medical Profemur® Total Hip System used in Plaintiff's hip replacement surgery were not reasonably safe for their intended use and were defective as described herein with respect to their warnings at the time that they were sold.

252.    Defective condition of the Profemur® Plus CoCr Modular Neck PHAC-1254, and the Wright Medical Profemur® Total Hip System used in Plaintiff's hip replacement surgery as

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

described in this Petition, was a direct and proximate cause of the injures and damages of the Plaintiff, as set forth in this Petition.

253.    To the extent that Defendant Wright Medical Technology, Inc., has exhausted its applicable liability insurance coverage, is insolvent, declares bankruptcy, or otherwise may not be before this Court and a party from whom total recovery may be had for Plaintiff's claim, pursuant to § 537.762,(1) and (2), RSMo, Barnes-Jewish West County Hospital is liable to the Plaintiff for the conduct, injuries and damages alleged in this count of this Petition.

## COUNT 3 – BREACH OF WARRANTY

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Petition.

254.    Defendant Wright Medical Technology, Inc., expressly warranted the performance, durability, and longevity of its Profemur® Plus CoCr Modular Neck PHAC-1254, through its marketing, advertising, distributors and sales representatives, as set forth in this Petition.

255.    Defendant Wright Medical Technology, Inc., impliedly warranted, through its marketing, advertising, distributors and sales representatives, that Profemur® Plus CoCr Modular Neck PHAC-1254, and the Wright Medical Profemur® Total Hip System were of merchantable quality, fit for the ordinary purposes and uses for which they were intended.

256.    The Defendant Wright Medical Technology, Inc., was aware that healthcare providers and patients, including the Plaintiff, rely upon the representations made by the Defendants when choosing, selecting and purchasing its products, including Profemur® Plus CoCr Modular Neck PHAC-1254, and the Wright Medical Profemur® Total Hip System.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

257.    Due to the negligent, defective and unreasonably dangerous design, manufacture and warnings of the Profemur® Plus CoCr Modular Neck PHAC-1254, and the Wright Medical Profemur® Total Hip System, it was neither of merchantable quality nor fit for the ordinary purposes for which it was sold, presenting an unreasonable risk of injury to patients, including Plaintiff, during foreseeable use.

258.    The defective and unreasonably dangerous condition of the Profemur® Plus CoCr Modular Neck PHAC-1254, and the Wright Medical Profemur® Total Hip System constituted a breach of the Defendant Wright Medical Technology, Inc.'s express and implied warranties, and such breach was a direct and proximate cause of the incident and injuries described herein.

259.    To the extent that Defendant Wright Medical Technology, Inc., has exhausted its applicable liability insurance coverage, is insolvent, declares bankruptcy, or otherwise may not be before this Court and a party from whom total recovery may be had for Plaintiff's claim, pursuant to § 537.762,(1) and (2), RSMo, Barnes-Jewish West County Hospital is liable to the Plaintiff for the conduct, injuries and damages alleged in this count of this Petition.

## COUNT 4 – NEGLIGENT MISREPRESENTATION

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Petition.

260.    Defendant Wright Medical Technology, Inc., had a duty to accurately and truthfully represent to the medical community, Plaintiff, and the public that the Profemur® Plus CoCr Modular Neck PHAC-1254, and the Wright Medical Profemur® Total Hip System, had not been adequately tested and found to be safe and effective for the treatment of damaged and worn parts of the hip joint. Instead, the representations made by the Defendant were false.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

261.    Defendant Wright Medical Technology, Inc., negligently misrepresented to the medical community, Plaintiff, and the public, the Profemur® Plus CoCr Modular Neck PHAC-1254, and the Wright Medical Profemur® Total Hip System's quality, performance, durability and longevity.

262.    Had Defendant Wright Medical Technology, Inc., accurately and truthfully represented to the medical community, Plaintiff, and the public the material facts relating to the risks of the Profemur® Plus CoCr Modular Neck PHAC-1254, and the Wright Medical Profemur® Total Hip System, Plaintiff and/or Plaintiff's healthcare provider would not have utilized Defendant's Wright Medical Profemur® CoCr modular neck, and the Wright Medical Profemur® Total Hip System for Plaintiff's treatment.

263.    As a direct and proximate result of Defendant Wright Medical Technology, Inc.'s negligent misrepresentation, Plaintiff was injured, and has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

264.    To the extent that Defendant Wright Medical Technology, Inc., has exhausted its applicable liability insurance coverage, is insolvent, declares bankruptcy, or otherwise may not be before this Court and a party from whom total recovery may be had for Plaintiff's claim, pursuant to § 537.762,(1) and (2), RSMo, Barnes-Jewish West County Hospital is liable to the Plaintiff for the conduct, injuries and damages alleged in this count of this Petition.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

## CONDUCT MERITING PUNITIVE DAMAGES

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Petition.

265.    The acts and omissions of the Defendant Wright Medical Technology, Inc., as set forth in detail above, constitute evidence of clear and convincing proof that it showed a complete indifference or conscious disregard for the safety and well-being of others.

## <u>DAMAGES</u>

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Petition.

266.    As a direct and proximate result of the acts and omissions of the Defendants alleged herein, Plaintiff was injured and damaged. The injuries and damages for which Plaintiff seeks compensation from the Defendants include, but are not limited to:

a.    physical pain and suffering of a past, present and future nature;

b.    emotional pain and suffering of a past, present and future nature;

c.    permanent impairment and scarring;

d.    medical bills and expenses of a past, present and future nature;

e.    loss of enjoyment of life;

f.    pre- and post-judgment interest;

g.    statutory and discretionary costs; and,

h.    all such further relief, both general and specific, to which he may be entitled to under the premises.

Electronically Filed - St Louis County - October 12, 2018 - 02:49 PM

## PRAYERS FOR RELIEF

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Petition.

WHEREFORE, Plaintiff Leonard L. Gillan prays for an award of compensatory damages against Defendant Wright Medical Technology, Inc., in an amount in excess of $25,000.00 that is fair and reasonable to compensate him for his personal injuries and damages alleged in this Petition, and for all such further relief, both general and specific, to which Plaintiff may be entitled under Missouri law; for an award of punitive damages, or exemplary damages, against a defendants Wright Medical Technology, Inc., and MicroPort, Inc, to punish each of them and deter similar conduct in the future; and for prejudgment and post judgment interest and costs.

To the extent that Defendant Wright Medical Technology, Inc., has exhausted its applicable liability insurance coverage, is insolvent, declares bankruptcy, or otherwise may not be before this Court and a party from whom total recovery may be had for Plaintiff's claims, pursuant to § 537.762,(1) and (2), RSMo, Plaintiff prays for an award of compensatory damages against Defendant Barnes-Jewish Hospital West, Inc., in the amount that otherwise would be the liability and judgment entered against Defendant Wright Medical Technology, Inc. .

### JURY DEMAND

Plaintiff requests a jury trial for all issues so triable.

Dated: October 12, 2018                                    Respectfully submitted,

                                                          */s/ James G. Krispin*
                                                          James G. Krispin, MBE #33991
                                                          1010 Market Street, Suite 1500
                                                          St. Louis, MO 63101
                                                          Phone: 314-721-2060
                                                          Fax: 314-726-5834
                                                          Email: jgkrislaw@aol.com
                                                          *Attorney for Plaintiff*



**IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI**

| Judge or Division:<br>STANLEY JAMES WALLACH | Case Number: 18SL-CC03881 |
|---|---|
| Plaintiff/Petitioner:<br>LEONARD L. GILLAN | Plaintiff's/Petitioner's Attorney/Address<br>JAMES GREGORY KRISPIN<br>1010 Market<br>Suite 1500<br>ST LOUIS, MO 63101 |
| vs. | |
| Defendant/Respondent:<br> WRIGHT MEDICAL TECHNOLOGY INC | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO 63105 |
| Nature of Suit:<br>CC Pers Injury-Prod Liab | (Date File Stamp) |

## Summons in Civil Case

| | |
|---|---|
| **The State of Missouri to:** | **WRIGHT MEDICAL TECHNOLOGY INC**<br>**Alias:** |

**221 BOLIVAR STREET**
**JEFFERSON CITY, MO 65101**

SERVE:  REGISTERED AGENT
CSC-LAWYERS INCORPORATING
SERVICE CO



*COURT SEAL OF*

*ST. LOUIS COUNTY*

      You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service.  If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.
      **SPECIAL NEEDS:  If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739, email at SLCADA@courts.mo.gov, or through Relay Missouri by dialing 711 or 800-735-2966, at least three business days in advance of the court proceeding.**

<u>23-OCT-2018</u>
**Date**

_____
**Clerk**

**Further Information:**
**ALD**

---

### Sheriff's or Server's Return

**Note to serving officer:**  Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by:  (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant's/Respondent's family over the age of 15 years who permanently resides with the Defendant/Respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to

_____ (name) _____(title).

☐ other _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____     _____
      Printed Name of Sheriff or Server                           Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

*(Seal)*       Subscribed and sworn to before me on _____ (date).

           My commission expires: _____     _____
                                     Date                             Notary Public

**Sheriff's Fees, if applicable**

| | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $____10.00____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | **$_____** |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent.  For methods of service on all classes of suits, see Supreme Court Rule 54.

**THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI**

Twenty First Judicial Circuit

**NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES**

**Purpose of Notice**

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place. This is often true even when the parties initially believe that settlement is not possible. A settlement reduces the expense and inconvenience of litigation. It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost. Often such services are most effective in reducing costs if used early in the course of a lawsuit. Your attorney can aid you in deciding whether and when such services would be helpful in your case.

**Your Rights and Obligations in Court Are Not Affected By This Notice**

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so. In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below. These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended. Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not. **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

**Alternative Dispute Resolution Procedures**

There are several procedures designed to help parties settle lawsuits. Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party. The services are provided by individuals and organizations who may charge a fee for this help. Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case. The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit. An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties. The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement. An effective mediator may offer solutions that have not been considered by the parties or their lawyers. A mediator may not impose his or her own judgment on the issues for that of the parties.

CCADM73

**(3) Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator.  The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions.  While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations.  The neutral third party may issue an advisory opinion regarding the merits of the case.  The advisory opinion is not binding.

**(5) Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations.  A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed.  After the "trial", the jurors retire to deliberate and then deliver an advisory verdict.  The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral.  As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals.  The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list.  The Circuit Clerk also has Neutral Qualifications Forms on file.  These forms have been submitted by the neutrals on the list and provide information on their background and expertise.  They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 105 South Central Ave., 5th Floor, Clayton, Missouri 63105.  The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral.  The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73



# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| Judge or Division:<br>STANLEY JAMES WALLACH | Case Number:  18SL-CC03881 |
|---|---|
| Plaintiff/Petitioner:<br>LEONARD L. GILLAN | Plaintiff's/Petitioner's Attorney/Address<br>JAMES GREGORY KRISPIN<br>1010 Market<br>Suite 1500<br>ST LOUIS, MO  63101 |
| **vs.** | |
| Defendant/Respondent:<br> WRIGHT MEDICAL TECHNOLOGY INC | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO  63105 |
| Nature of Suit:<br>CC Pers Injury-Prod Liab | (Date File Stamp) |

## Summons in Civil Case

| | |
|---|---|
| **The State of Missouri to:**  BARNES-JEWISH WEST COUNTY HOSPITAL<br>Alias: | |

**221 BOLIVAR STREET**
**JEFFERSON CITY, MO  65101**

SERVE:  REGISTERED AGENT
CSC-LAWYERS INCORPORATING
SERVICE CO

*COURT SEAL OF*



*ST. LOUIS COUNTY*

       **You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service.  If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.**
       **SPECIAL NEEDS:  If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739, email at SLCADA@courts.mo.gov, or through Relay Missouri by dialing 711 or 800-735-2966, at least three business days in advance of the court proceeding.**

<u>23-OCT-2018</u>
**Date**

_____
                                    Clerk

**Further Information:**
**ALD**

### Sheriff's or Server's Return

**Note to serving officer:**  Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by:  (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with
_____ a person of the Defendant's/Respondent's family over the age of 15 years who permanently resides with the Defendant/Respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to
_____ (name) _____(title).

☐ other _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____          _____
     Printed Name of Sheriff or Server                                   Signature of Sheriff or Server

              **Must be sworn before a notary public if not served by an authorized officer:**

          Subscribed and sworn to before me on _____ (date).

*(Seal)*

          My commission expires: _____          _____
                              Date                                                   Notary Public

**Sheriff's Fees, if applicable**

| | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | **$_____** |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent.  For methods of service on all classes of suits, see Supreme Court Rule 54.

## THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

Twenty First Judicial Circuit

## NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES

### Purpose of Notice

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place. This is often true even when the parties initially believe that settlement is not possible. A settlement reduces the expense and inconvenience of litigation. It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost. Often such services are most effective in reducing costs if used early in the course of a lawsuit. Your attorney can aid you in deciding whether and when such services would be helpful in your case.

### Your Rights and Obligations in Court Are Not Affected By This Notice

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so. In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below. These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended. Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not. **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

### Alternative Dispute Resolution Procedures

There are several procedures designed to help parties settle lawsuits. Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party. The services are provided by individuals and organizations who may charge a fee for this help. Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case. The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit. An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties. The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement. An effective mediator may offer solutions that have not been considered by the parties or their lawyers. A mediator may not impose his or her own judgment on the issues for that of the parties.

CCADM73

**(3) Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator.  The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions.  While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations.  The neutral third party may issue an advisory opinion regarding the merits of the case.  The advisory opinion is not binding.

**(5) Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations.  A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed.  After the "trial", the jurors retire to deliberate and then deliver an advisory verdict.  The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral.  As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals.  The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list.  The Circuit Clerk also has Neutral Qualifications Forms on file.  These forms have been submitted by the neutrals on the list and provide information on their background and expertise.  They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 105 South Central Ave., 5th Floor, Clayton, Missouri 63105.  The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral.  The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73

Electronically Filed - St Louis County - November 08, 2018 - 11:27 AM

## IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
## STATE OF MISSOURI

| | |
|---|---|
| LEONARD L. GILLAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Cause No.: 18SL-CC03881 |
| WRIGHT MEDICAL TECHNOLOGY, INC., | ) |
| | ) |
| and | ) |
| | ) |
| BARNES-JEWISH WEST COUNTY HOSPITAL,) | |
| | ) |
| Defendants. | ) |

## MOTION FOR ADMISSION OF VISITING
## ATTORNEY GEORGE E. McLAUGHLIN

Pursuant to Missouri Rules of Civil Procedure 9.03, James G. Krispin, a member of the Missouri Bar of this Court in good standing, moves for the admission of George E. McLaughlin, a member of the bar of the State of Colorado, for the purpose of this case only.

1.     Mr. McLaughlin is an attorney and a member of the law firm of Warshauer-McLaughlin Law Group, P.C., with an office in Colorado.  Mr. McLaughlin works out of his office located at 1890 Gaylord Street, Denver, CO 80206.

2.     Mr. McLaughlin is an active member in good standing and currently eligible to practice law in the following jurisdictions:

    State of Colorado (01/02/1987)
    Attorney Registration No. 16364

    State of Ohio (11/07/1980)
    Attorney Registration No. 0003932

Electronically Filed - St Louis County - November 08, 2018 - 11:27 AM

State of West Virginia (09/25/1979)
Attorney Registration No. 2484

U.S. Supreme Court (02/21/2006)
U.S. Court of Appeals for the 4th Circuit (08/26/1987)
U.S. Court of Appeals for the 6th Circuit (08/19/2003)
U.S. Court of Appeals for the 7th Circuit (04/13/2010)
U.S.D.C., Northern District of West Virginia (10/25/1979)
U.S.D.C., Southern District of West Virginia (08/19/2003)
U.S.D.C., Southern District of Ohio (04/24/1996)
U.S.D.C., Northern District of Ohio (01/05/2011)
U.S.D.C., Eastern and Western Districts of Arkansas (07/20/1998)
U.S.D.C., Western District of Pennsylvania (07/27/1999)
U.S.D.C., Eastern District of Michigan (10/18/2000)
U.S.D.C., District of Colorado (09/26/2001)
U.S.D.C., Western District of Oklahoma (06/26/2008)
U.S.D.C., Northern District of Oklahoma (09/25/2008)
U.S.D.C., Western District of Tennessee (01/19/2011)
U.S.D.C., Western District of Texas (02/10/2009)
U.S.D.C., Northern District of Texas (06/29/2007)
U.S.D.C., Northern District of Illinois (05/03/2010)
U.S.D.C., Central District of Illinois (04/30/2007)
U.S.D.C., Southern District of Illinois (04/12/2011)
U.S.D.C., Western District of Wisconsin (11/16/2011)
U.S.D.C., Eastern District of Wisconsin (04/14/2014)
U.S.D.C., Northern District of Indiana (03/16/2016)
U.S. Court of Federal Claims (07/19/1996)

3.      Neither Mr. McLaughlin nor any member of his firm is now, or has ever been, under suspension or disbarment by any court and there are no disciplinary proceedings pending against Mr. McLaughlin or any member of his firm.

4.      Movant seeks leave of this Court for Mr. McLaughlin to participate as counsel *pro hac vice* for the Plaintiff in any and all court proceedings in the above-captioned action.

Electronically Filed - St Louis County - November 08, 2018 - 11:27 AM

5.      Mr. McLaughlin has a high degree of familiarity with the facts involved in the above-captioned matter.

6.      A copy of the receipt for the *pro hac vice* admission fee paid on behalf of Mr. McLaughlin, pursuant to Missouri Supreme Court Rule 6.01(m), is attached hereto as Exhibit "A."

7.      Mr. McLaughlin has designated James G. Krispin, Attorney at Law, as counsel in this case.  Movant is a licensed Missouri attorney who has already entered his appearance as counsel of record for Plaintiff in the above-captioned matter.

8.      Mr. McLaughlin's Affidavit, swearing to all of the foregoing facts, is attached hereto as Exhibit "B."

9.      The movant states that he as well as Mr. McLaughlin have read the rules of this Court concerning a visiting attorney and will abide by them.

A proposed Order is submitted herewith.

WHEREFORE, Movant respectfully requests that this Court grant his motion and permit Mr. McLaughlin to enter his appearance and act as a counsel *pro hac vice* for Plaintiff in the above-captioned case.

Respectfully submitted,

*/s/ James G. Krispin*
James G. Krispin, MBE #33991
1010 Market Street, Suite 1500
St. Louis, MO 63101
Phone: 314-721-2060
Fax: 314-726-5834
Email: jgkrislaw@aol.com
*Attorney for Plaintiff*

Electronically Filed - St Louis County - November 08, 2018 - 11:27 AM

**IN THE CIRCUIT COURT OF ST. LOUIS COUNTY**
**STATE OF MISSOURI**

| | | |
|---|---|---|
| LEONARD L. GILLAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Cause No.: 18SL-CC03881 |
| WRIGHT MEDICAL TECHNOLOGY, INC., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BARNES-JEWISH WEST COUNTY HOSPITAL, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>AFFIDAVIT OF GEORGE E. McLAUGHLIN</u>**

I, George E. McLaughlin, of lawful age, being first duly sworn upon my oath, states the following matters are true to the best of my knowledge, information and belief:

1. Full name of the movant-attorney:

   George E. McLaughlin

2. My office address is: 1890 Gaylord Street, Denver, Colorado 80206.

3. I am an active member in good standing and currently eligible to practice law in the following jurisdictions:

   State of Colorado (01/02/1987)
   Attorney Registration No. 16364

   State of Ohio (11/07/1980)
   Attorney Registration No. 0003932

   State of West Virginia (09/25/1979)
   Attorney Registration No. 2484

1

Electronically Filed - St Louis County - November 08, 2018 - 11:27 AM

U.S. Supreme Court (02/21/2006)
U.S. Court of Appeals for the 4th Circuit (08/26/1987)
U.S. Court of Appeals for the 6th Circuit (08/19/2003)
U.S. Court of Appeals for the 7th Circuit (04/13/2010)
U.S. Court of Appeals for the 10th Circuit (11/07/2014)
U.S.D.C., Northern District of West Virginia (10/25/1979)
U.S.D.C., Southern District of West Virginia (08/19/2003)
U.S.D.C., Southern District of Ohio (04/24/1996)
U.S.D.C., Northern District of Ohio (01/05/2011)
U.S.D.C., Eastern and Western Districts of Arkansas (07/20/1998)
U.S.D.C., Western District of Pennsylvania (07/27/1999)
U.S.D.C., Eastern District of Michigan (10/18/2000)
U.S.D.C., District of Colorado (09/26/2001)
U.S.D.C., Western District of Oklahoma (06/26/2008)
U.S.D.C., Northern District of Oklahoma (09/25/2008)
U.S.D.C., Western District of Tennessee (01/19/2011)
U.S.D.C., Western District of Texas (02/10/2009)
U.S.D.C., Northern District of Texas (06/29/2007)
U.S.D.C., Northern District of Illinois (05/03/2010)
U.S.D.C., Central District of Illinois (04/30/2007)
U.S.D.C., Southern District of Illinois (04/12/2011)
U.S.D.C., Western District of Wisconsin (11/16/2011)
U.S.D.C., Eastern District of Wisconsin (04/14/2014)
U.S.D.C., Northern District of Indiana (03/16/2016)
U.S. Court of Federal Claims (07/19/1996)

4.      I have not been suspended or disbarred by any bar.  Upon information and belief, no member of my firm has been suspended or disbarred.

5.      In seeking permission to appear before this Court *pro hac vice*, I agree to comply with the Rules of Professional Conduct, as set forth in Missouri Supreme Court Rule 4.  In addition, I agree to become subject to discipline by the courts of this state.

6.      If I am granted permission to appear before this Court, I will designate James G. Krispin Attorney at Law, 1010 Market St., Ste. 1500, St. Louis, MO 63101 as counsel to assist me in this proceeding.

Electronically Filed - St. Louis County - November 08, 2018 - 11:27 AM

7.     The admission *pro hac vice* is sought under Missouri Supreme Court Rule 9.03 for the limited purpose of allowing me to participate and appear in the litigation and all related matters in the case of *Leonard Gillan v. Wright Medical Technology, et al,* Cause No: , now pending in this Court.

8.     Movant attests under penalty of perjury the truth and accuracy of the foregoing facts, and respectfully requests that this motion be granted and that the movant be admitted *pro hac vice* to the bar of the court in the instant matter.

Dated this 31st day of October 2018

_____
George E. McLaughlin

STATE OF COLORADO   )
                    )       ss
COUNTY OF DENVER    )

Subscribed and sworn to before me by George E. McLaughlin this 31st day of October 2018.

Witness my hand and official seal.

_____
Notary Public

ELLEN V LARSON
Notary Public
State of Colorado
Notary ID # 20014031854
My Commission Expires 10-29-2021

3

Electronically Filed - St Louis County - November 08, 2018 - 11:27 AM



## CLERK OF THE SUPREME COURT
### STATE OF MISSOURI
### POST OFFICE BOX 150
### JEFFERSON CITY, MISSOURI
### 65102

BETSY AUBUCHON
CLERK

TELEPHONE
(573) 751-4144

October 29, 2018

*This will hereby acknowledge receipt of $410 as required by Rule 6.01(m) for George E. McLaughlin, appearing in Leonard Gillan v. Wright Medical Technology, Inc. and Barnes-Jewish West County Hospital, Case No. 18SL-CC03881, before the Circuit Court of St. Louis County, State of Missouri.*

Betsy AuBuchon, Clerk

Electronically Filed - St Louis County - November 08, 2018 - 11:27 AM

**IN THE CIRCUIT COURT OF ST. LOUIS COUNTY**
**STATE OF MISSOURI**

| | |
|---|---|
| LEONARD L. GILLAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Cause No.: 18SL-CC03881 |
| WRIGHT MEDICAL TECHNOLOGY, INC., | ) |
| | ) |
| and | ) |
| | ) |
| BARNES-JEWISH WEST COUNTY HOSPITAL,) |
| | ) |
| Defendants. | ) |

## ORDER

This Court, after reviewing Plaintiff Leonard Gillan's Motion for Admission *Pro Hac Vice*, finds that the requirements for admission *pro hac vice* pursuant to Missouri Supreme Court Rule 9.03 have been satisfied.

IT IS THEREFORE ORDERED that George E. McLaughlin is admitted to practice in the above-captioned matter on behalf of Plaintiff Leonard Gillan.

Dated this _____ day of _____, 2018.


_____
So Ordered



# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| Judge or Division:<br>STANLEY JAMES WALLACH | Case Number: 18SL-CC03881 |
|---|---|
| Plaintiff/Petitioner:<br>LEONARD L. GILLAN | Plaintiff's/Petitioner's Attorney/Address<br>JAMES GREGORY KRISPIN<br>1010 Market<br>Suite 1500<br>ST LOUIS, MO 63101 |
| vs. | |
| Defendant/Respondent:<br>WRIGHT MEDICAL TECHNOLOGY INC | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO 63105 |
| Nature of Suit:<br>CC Pers Injury-Prod Liab | (Date File Stamp) |

**RECEIVED**

OCT 2 9 2018

COLE COUNTY
CLERK'S OFFICE

**FILED**

NOV 15 2018

JOAN M. GILMER
CIRCUIT CLERK, ST. LOUIS COUNTY

## Summons in Civil Case

**The State of Missouri to:** WRIGHT MEDICAL TECHNOLOGY INC
**Alias:**

**221 BOLIVAR STREET**
**JEFFERSON CITY, MO 65101**

SERVE: REGISTERED AGENT
CSC-LAWYERS INCORPORATING
SERVICE CO

**COURT SEAL OF**



**ST. LOUIS COUNTY**

   You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.
   **SPECIAL NEEDS:** If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739, email at SLCADA@courts.mo.gov, or through Relay Missouri by dialing 711 or 800-735-2966, at least three business days in advance of the court proceeding.

**23-OCT-2018**
**Date**

_____
Clerk

**Further Information:**
**ALD**

### Sheriff's or Server's Return

**Note to serving officer:** Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by: (check one)
☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant's/Respondent's family over the age of 15 years who permanently resides with the Defendant/Respondent.
☒ (for service on a corporation) delivering a copy of the summons and a copy of the petition to

CSC lawyers, S.C. _____ (name) Designee _____ (title).

☐ other _____

Served at 350 E. High _____ (address)

in Colo _____ (County/City of St. Louis), MO, on 10-31-18 _____ (date) at 800 AM _____ (time).

Sheriff John P Wheeler _____ By J.A. Aimee Wiss _____

**Printed Name of Sheriff or Server**      **Signature of Sheriff or Server**

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____
**Date**                                    **Notary Public**



**Sheriff's Fees, if applicable**

| | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent.  For methods of service on all classes of suits, see Supreme Court Rule 54.

# THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

## Twenty First Judicial Circuit

## NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES

### Purpose of Notice

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place. This is often true even when the parties initially believe that settlement is not possible. A settlement reduces the expense and inconvenience of litigation. It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost. Often such services are most effective in reducing costs if used early in the course of a lawsuit. Your attorney can aid you in deciding whether and when such services would be helpful in your case.

### Your Rights and Obligations in Court Are Not Affected By This Notice

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so. In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below. These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended. Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not. **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

### Alternative Dispute Resolution Procedures

There are several procedures designed to help parties settle lawsuits. Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party. The services are provided by individuals and organizations who may charge a fee for this help. Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case. The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit. An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties. The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement. An effective mediator may offer solutions that have not been considered by the parties or their lawyers. A mediator may not impose his or her own judgment on the issues for that of the parties.

CCADM73

. **(3) Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator. The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions. While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations. The neutral third party may issue an advisory opinion regarding the merits of the case. The advisory opinion is not binding.

**(5) Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations. A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed. After the "trial", the jurors retire to deliberate and then deliver an advisory verdict. The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral. As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals. The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list. The Circuit Clerk also has Neutral Qualifications Forms on file. These forms have been submitted by the neutrals on the list and provide information on their background and expertise. They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 105 South Central Ave., 5th Floor, Clayton, Missouri 63105. The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral. The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73



# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| Judge or Division:<br>STANLEY JAMES WALLACH | Case Number: 18SL-CC03881 |
|---|---|
| Plaintiff/Petitioner:<br>LEONARD L. GILLAN | Plaintiff's/Petitioner's Attorney/Address<br>JAMES GREGORY KRISPIN<br>1010 Market<br>Suite 1500<br>ST LOUIS, MO 63101 |
| vs. | |
| Defendant/Respondent:<br>WRIGHT MEDICAL TECHNOLOGY INC | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO 63105 |
| Nature of Suit:<br>CC Pers Injury-Prod Liab | |

**RECEIVED**
OCT 2 9 2018
COLE COUNTY
SHERIFF'S OFFICE

**FILED**
(Date File Stamp)
NOV 1 5 2018

JOAN M. GILMER
CIRCUIT CLERK, ST LOUIS COUNTY

## Summons in Civil Case

The State of Missouri to: **BARNES-JEWISH WEST COUNTY HOSPITAL**
Alias:

**221 BOLIVAR STREET**
**JEFFERSON CITY, MO 65101**

SERVE: REGISTERED AGENT
CSC-LAWYERS INCORPORATING
SERVICE CO



**COURT SEAL OF**

**ST. LOUIS COUNTY**

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.
SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739, email at SLCADA@courts.mo.gov, or through Relay Missouri by dialing 711 or 800-735-2966, at least three business days in advance of the court proceeding.

<u>23-OCT-2018</u>
Date

Further Information:
ALD

_____
Clerk

| Sheriff's or Server's Return |
|---|

**Note to serving officer:** Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant's/Respondent's family over the age of 15 years who permanently resides with the Defendant/Respondent.

☑ (for service on a corporation) delivering a copy of the summons and a copy of the petition to
CSC Lawyers), S.L. _____ (name) Designee _____ (title).

☐ other _____

Served at 350 E. High _____ (address)

in Cole _____ (County/City of St. Louis), MO, on 10-31-18 _____ (date) at 800 Am (time).

Sheriff John P Wheeler _____ By _____ Sgt. Aimee Wrae _____
Printed Name of Sheriff or Server        Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____
                                    Date                                    Notary Public



**Sheriff's Fees, if applicable**

| | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

Case: 4:18-cv-02013-CDP   Doc. #: 1-1   Filed: 11/30/18   Page: 74 of 76 PageID #: 85

# THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

## Twenty First Judicial Circuit

## NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES

### Purpose of Notice

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place.  This is often true even when the parties initially believe that settlement is not possible.   A settlement reduces the expense and inconvenience of litigation. It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost.  Often such services are most effective in reducing costs if used early in the course of a lawsuit. Your attorney can aid you in deciding whether and when such services would be helpful in your case.

### Your Rights and Obligations in Court Are Not Affected By This Notice

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so.  In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below.   These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended.   Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not.  **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

### Alternative Dispute Resolution Procedures

There are several procedures designed to help parties settle lawsuits.   Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party.  The services are provided by individuals and organizations who may charge a fee for this help.  Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case.  The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit.  An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties.  The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement.   An effective mediator may offer solutions that have not been considered by the parties or their lawyers.  A mediator may not impose his or her own judgment on the issues for that of the parties.

CCADM73

**(3) Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator. The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions. While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations. The neutral third party may issue an advisory opinion regarding the merits of the case. The advisory opinion is not binding.

**(5) Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations. A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed. After the "trial", the jurors retire to deliberate and then deliver an advisory verdict. The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral. As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals. The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list. The Circuit Clerk also has Neutral Qualifications Forms on file. These forms have been submitted by the neutrals on the list and provide information on their background and expertise. They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 105 South Central Ave., 5th Floor, Clayton, Missouri 63105. The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral. The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73

Electronically Filed - St Louis County - November 08, 2018 - 11:27 AM

**IN THE CIRCUIT COURT OF ST. LOUIS COUNTY**
**STATE OF MISSOURI**

FILED

NOV 1 9 2018

JOAN M. GILMER
CIRCUIT CLERK, ST. LOUIS COUNTY

LEONARD L. GILLAN,                          )
                                            )
    Plaintiff,                          )
                                            )
v.                                          )
                                            )   Cause No.: 18SL-CC03881
WRIGHT MEDICAL TECHNOLOGY, INC.,            )
                                            )
and                                         )
                                            )
BARNES-JEWISH WEST COUNTY HOSPITAL,)
                                            )
    Defendants.                         )

**ORDER**

    This Court, after reviewing Plaintiff Leonard Gillan's Motion for Admission *Pro Hac Vice*, finds that the requirements for admission *pro hac vice* pursuant to Missouri Supreme Court Rule 9.03 have been satisfied.

    IT IS THEREFORE ORDERED that George E. McLaughlin is admitted to practice in the above-captioned matter on behalf of Plaintiff Leonard Gillan.

    Dated this 19th day of November, 2018.

So Ordered

WALLACE

Div 12